IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CANDICE TREPES, | ) | CASE NO. 1:18-cv-00233 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Candice Trepes ("Plaintiff" or "Trepes") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 12.   As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Trepes filed an application for DIB on February 23, 2013, alleging disability beginning

December 13, 2012.  Tr. 118, 132, 154, 284.  Trepes alleged disability due to myasthenia gravis,[1]

postural orthostatic tachycardia syndrome ("POTS"),[2] neck injury, shoulder pain, restless leg

---

[1] "Myasthenia gravis is a chronic autoimmune neuromuscular disease that causes weakness in the skeletal muscles, which are responsible for breathing and moving parts of the body, including the arms and legs.  The name myasthenia gravis, which is Latin and Greek in origin, means 'grave, or serious, muscle weakness.'" https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Myasthenia-Gravis-Fact-Sheet (last visited 4/16/2019).

[2] Postural orthostatic tachycardia syndrome is "a group of symptoms (not including hypotension) that sometimes occur when a person assumes an upright position, including tachycardia, tremulousness, lightheadedness, sweating, and hyperventilation; this is seen more often in women than in men, and the etiology is uncertain."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1844.

syndrome, mitral prolapsed valve, and difficulties with focus.  Tr. 118, 134, 178, 191, 317.

After initial denial by the state agency (Tr. 177-185) and denial upon reconsideration (Tr. 191-197), Trepes requested a hearing (Tr. 199-206).

On April 7, 2015, the Administrative Law Judge ("ALJ") conducted an administrative hearing. Tr. 89-117.  The ALJ issued an unfavorable decision on May 6, 2015.  Tr. 151-168. Trepes requested review of the May 6, 2015, decision by the Appeals Council.  Tr. 171.  On July 9, 2016, the Appeals Council remanded the case to the ALJ to: obtain medical expert testimony to help determine the nature, severity and limiting effects of Trepes' migraines and fibromyalgia; further evaluate Trepes' visual impairments; further consider Trepes' RFC; and obtain supplemental evidence from a vocational expert to clarify the assessed limitations on Trepes' occupational base.  Tr. 169-174.

Pursuant to the remand order, the ALJ conducted another hearing on November 10, 2016. Tr. 44-88.  Following the hearing, the ALJ issued an unfavorable decision on December 5, 2016, (Tr. 15-43), finding Trepes had not been under a disability within the meaning of the Social Security Act from December 13, 2012, through the date of the decision (Tr. 19, 35).  Trepes requested review by the Appeals Council of the ALJ's December 5, 2016, decision.  Tr. 282-283. On December 4, 2017, the Appeals Council denied Trepes' request for review, making the ALJ's December 5, 2016, decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Trepes was born in 1978.  Tr. 49, 94, 118, 284.  She was 38 years old at the time of the November 2016 hearing.  Tr. 49.  Trepes completed high school.  Tr. 49, 94.  She attended a few classes at Tri-C but stopped after she started passing out and having seizures.  Tr. 50.  Trepes

lived with her husband and mother in an apartment. Tr. 50, 94. Her husband was not working; he is a disabled Veteran. Tr. 50, 94. Trepes last worked in December 2012 at Sears as a customer service representative. Tr. 50, 95. Her worked involved working with customers and handling office work. Tr. 95. She left her job at Sears due to medical leave. Tr. 96. Trepes received short-term disability from Sears. Tr. 98.

**B.    Medical evidence**

**1.    Treatment records**

*Physical impairment treatment*

In 2007, Trepes was involved in a car accident causing injury to her neck. Tr. 908. Trepes began seeing Dr. David Demangone, M.D., for pain management in 2007. Tr. 908. Trepes continued seeing Dr. Demangone through 2015 for cervical spine, right shoulder and back pain. *See e.g.*, Tr. 575, 577, 581, 719, 774, 778-780, 890, 922, 924, 942. At times, Trepes reported pain radiating into her low back that caused decreased strength, an inability to move, and numbness in her left arm and fingers in her left hand, which was affecting her ability to grip and caused her to drop things. Tr. 890, 924. Dr. Demangone's diagnoses included cervical/thoracic radiculitis, myofascial pain, spondylosis of the cervical spine, and brachial plexopathy. Tr. 575, 577, 774, 908, 923, 942. Dr. Demangone prescribed various medications, including Percocet and Mobic. *See e.g.*, Tr. 575, 777, 889, 922, 923, 924, 942. Dr. Demangone noted that the pain medications Trepes was taking enabled her to perform her activities of daily living and improved her mobility. *See e.g.*, Tr. 580, 777, 922, 924. Dr. Demangone also administered epidural steroid injections, brachial plexus/interscalene sympathetic blocks, and trigger point injections, without much relief. Tr. 575, 577, 580, 581, 777, 778.

On December 19, 2012, Trepes was treated at the emergency room with complaints of a cough and fever. Tr. 509. During her visit, she relayed that she had blurry vision at times that seemed to resolve on its own. Tr. 509. She also reported an increased heart rate, shortness of breath and wheezing. Tr. 509. Trepes denied heart problems. Tr. 509. She noted a history of myasthenia gravis since she was a child. Tr. 509. The emergency room diagnosis was pneumonia and dehydration. Tr. 510. Trepes was given IV fluids and breathing treatments while admitted, which Trepes indicated made her feel much better. Tr. 510. She was discharged in improved condition with prescriptions for Augmentin and Albuterol. Tr. 510.

Trepes sought emergency room treatment again on January 1, 2013, with complaints of abdominal pain. Tr. 489. She described a headache and having some vomiting and occasional diarrhea. Tr. 489. Trepes' vision was normal. Tr. 489. On physical examination, a regular heart rate and rhythm were observed with mild tachycardia. Tr. 490. No obvious motor or sensory deficits were observed in the upper or lower extremities. Tr. 490. Trepes was treated for right upper quadrant abdominal pain, nausea and vomiting, diarrhea and acute colitis. Tr. 490.

During a January 18, 2013, follow-up visit with Dr. Michelle D. Inkster, M.D., Ph.D., regarding her diarrhea, Trepes started to feel hot and dizzy, which she described as pre-seizure syndrome. Tr. 548. Trepes lay down and started to feel better after a few minutes. Tr. 548. Trepes' heart rate by palpitation was 100. Tr. 548. Trepes' last seizure had been 4 years earlier. Tr. 548. During another follow-up visit on January 25, 2013, with Dr. Inkster regarding her diarrhea, Trepes relayed that she was tired all the time and just wanted to sleep but was only getting 2 hours of sleep at a time. Tr. 555. Trepes was drinking a lot of fluids and urinating. Tr. 555. She reported feeling dizzy upon standing and she had headaches. Tr. 555. Trepes reported seeing her pain management physician but she did not want to change pain management

medications until other causes of her bowel problems had been ruled out. Tr. 555. Dr. Inkster noted that Trepes had been tested for POTS in 2002 and had a positive tilt test. Tr. 556. However, Trepes was never given medication for POTS. Tr. 556. Trepes was tested for C difficile and was referred to cardiology for evaluation of her fatigue, sleepiness, and tachycardia. Tr. 556.

On February 4, 2013, Trepes saw Arthur Ulatowski, D.O., with the Cardiovascular Clinic, Inc., for a cardiac evaluation. Tr. 645-647. Trepes presented with tachycardia (associated signs and symptoms included rapid heartbeat and lightheadedness), fatigue, and syncope (no episode since 2008 or 2009). Tr. 645. Trepes denied any vision problems. Tr. 645. Trepes complained of arthralgias and myalgias but denied muscle cramps or muscle weakness and denied neurological symptoms, e.g., weakness, dizziness, numbness, confusion, memory loss, impaired speech and syncope. Tr. 645. Dr. Ulatowski diagnosed palpitations, tachycardia, and orthostatic hypotension. Tr. 646. Dr. Ulatowski started Trepes on Metoprolol.[3] Tr. 646. Trepes followed up with Dr. Ulatowski on February 11, 2013. Tr. 640-641. Trepes complained of lightheadedness, palpitations, and tachycardia but she relayed that her palpitations were better since starting the beta-blocker. Tr. 640. Trepes also complained of blurred vision but denied any vision loss, visual disturbance or double vision. Tr. 640. She denied arthralgias, muscle cramps, muscle weakness, or myalgias. Tr. 640. Dr. Ulatowski diagnosed tachycardia and palpitations. Tr. 641. Dr. Ulatowski discussed strategies for dealing with POTS, including increased fluid intake and wearing waist high hose daily. Tr. 641.

On February 20, 2013, Trepes saw Dr. Michael Deucher, M.D., FACC, of Cardiovascular Medicine Associates, Inc., for an opinion regarding her POTS. Tr. 598-599. Trepes reported

---

[3] Metoprolol Succinate is a "beta-blocker used to treat chest pain (angina), heart failure, and high blood pressure." https://www.webmd.com/drugs/2/drug-8814/metoprolol-succinate-oral/details (last visited 4/16/2019).

having a lot of fatigue and having a difficult time going up the stairs – she had to crawl. Tr. 598. She did not have chest pain. Tr. 598. On examination, Dr. Deucher observed a normal gait for Trepes' age; no scoliosis or thoracic kyphosis; and intact motor strength and tone in the upper and lower extremities bilaterally. Tr. 599. Dr. Deucher's assessment was autonomic nervous system disorder, unspecified and myasthenia gravis with acute exacerbation. Tr. 599. Dr. Deucher advised about fluid and sodium intake for her POTS and started her on Paxil. Tr. 599.

In February 2013, Trepes also followed up with her neurologist Dr. Lisa Kurtz, M.D., who first saw Trepes in May 2007 (Tr. 610). Tr. 618. Trepes relayed she had started to have pain between her left shoulder blade and spine with movement or trying to sleep. Tr. 618. The pain was radiating down her back to her waist. Tr. 618. The pain was gradual initially but was occurring more frequently. Tr. 618. Trepes complained of lightheadedness with her POTS. Tr. 618. Trepes explained she was seeing Dr. Deucher for her POTS. Tr. 618. When Trepes saw Dr. Kurtz on March 4, 2013, Trepes reported she was taking Metoprolol, Paxil, and Mestinon. Tr. 617. She was no longer taking Neurontin. Tr. 617. Trepes was having difficulty sleeping. Tr. 617. Trepes expressed an interest in physical therapy for her neck and would consider a repeat injection with her pain doctor. Tr. 617. Dr. Kurtz indicated that Trepes' myasthenia gravis was stable on Mestinon. Tr. 617. Dr. Kurtz recommended that Trepes restart Neurontin for her neck pain and insomnia and she provided Trepes with a referral for physical therapy. Tr. 617. Trepes saw Dr. Kurtz a few weeks later on March 25, 2013. Tr. 616. Trepes indicated that Neurontin did nothing and did not help her sleep. Tr. 616. She also indicated she was unable to afford the co-pays associated with physical therapy so she did not proceed with therapy. Tr. 616. Trepes had borrowed a TENS unit from a friend but reported that it was aggravating even on a low setting. Tr. 616. She was unable to sleep more than 2 hours; she was having problems with

restless leg syndrome; she was having problems concentrating and remembering things; and she was fatigued, noting it was a chore to even get up and use the restroom. Tr. 616. Dr. Kurtz noted that Trepes was seeking a continuation of her short-term disability from work and she was applying for social security disability. Tr. 616. Dr. Kurtz increased Trepes' Neurontin and continued Trepes' Mestinon. Tr. 616.

Trepes followed up with Dr. Deucher on March 25, 2013. Tr. 596-597. Trepes was feeling a little better but still having some issues. Tr. 596. She was still getting palpitations/rapid heart beat a couple of times each week, with an episode lasting 5-30 minutes. Tr. 596. Trepes had not passed out recently. Tr. 596. She reported drinking a lot of water and increasing her salt intake. Tr. 596. Trepes reported having digestive issues and abdominal pains; restless leg syndrome; and trouble remembering things and focusing. Tr. 596. She continued to smoke about a 1/4 pack of cigarettes per day. Tr. 596. Physical examination findings were unremarkable. Tr. 597. Dr. Deucher felt that Trepes was doing a little better on Paxil. Tr. 597. He advised Trepes that, if she had more episodes of a rapid heart beat, she could take an extra half of her Metoprolol. Tr. 597. From a cardiac standpoint, Dr. Deucher indicated that he felt that Trepes could return to work at Sears but noted that Trepes informed him that Dr. Kurtz was applying for long-term disability for Trepes due to her myasthenia and because her neurological weakness was getting worse. Tr. 597.

During a June 18, 2013, visit with Dr. Kurtz, Trepes relayed that she was "not good." Tr. 886. Trepes had been having a migraine since the prior Friday and she had passed out the prior Thursday while sitting in a chair. Tr. 886. Trepes had communicated with her POTS' doctor and her Florinef was increased. Tr. 886. Trepes also indicated that, after the event on Thursday, she was not sleeping and her memory was in a fog. Tr. 886. Trepes denied any bowel or bladder

incontinence with the event.  Tr. 886.  Dr. Kurtz indicated that Trepes had probably had a seizure on the prior Thursday.  Tr. 886.  Dr. Kurtz planned to check Trepes' labs.  Tr. 886.  Dr. Kurtz noted that poor sleep/insomnia may have been a factor.  Tr. 886.  She recommended that Trepes try Ambien.  Tr. 886.

Trepes saw Dr. Kurtz on July 24, 2013, for follow up on lab work.  Tr. 806.  During the visit, Trepes reported blurry vision 95% of the time; she had numbness and tingling and weakness in her arms; she was dropping things and unable to use a computer; she had lightheadedness; she was not sleeping, even with Ambien; and she had decreased focus/concentration.  Tr. 806.  Trepes' Vitamin B12 and D levels were low.  Tr. 806.  Dr. Kurtz advised Trepes to speak to her primary care physician about Vitamin B12 injections and a Vitamin D supplement.  Tr. 806.

When Trepes saw Dr. Kurtz on October 9, 2013, Trepes relayed that she had started Vitamin B12 injections and was taking a Vitamin D supplement but she was still tired and had no energy.  Tr. 884.  Her headaches were worse than ever.  Tr. 884.  Imitrex injections helped with her headaches.  Tr. 884.  Trepes was still not sleeping well and complained of blurry vision, which she felt was worse.  Tr. 884.  Dr. Kurtz noted that Trepes' myasthenia gravis was stable on Mestinon.  Tr. 884.  Dr. Kurtz recommended that Trepes follow up with an eye doctor for an evaluation.  Tr. 884.  Trepes planned to follow up with her cardiologist regarding syncope and lightheadedness.  Tr. 884.  Trepes reported seizures at night.  Tr. 884.  Trepes' Lamictal was increased and Trazadone was increased for Trepes' migraines and insomnia.  Tr. 884.

On October 24, 2013, Trepes presented herself to the emergency room due to worsening shortness of breath and cough.  Tr. 815-829.  She was treated and discharged on October 28, 2013.  Tr. 827-829.  Trepes was started on Keppra to supplement her anti-epileptic regimen.  Tr.

827.  Diagnoses during Trepes' admission were acute bronchitis, myasthenia gravis, and tachycardia.  Tr. 823.  During her admission, Trepes saw Dr. Suresh Kumar, M.D., for a consultation regarding her myasthenia gravis and seizures.  Tr. 844-845.  Trepes relayed to Dr. Kumar that, during her admission, she had a couple brief seizures that happened at night.  Tr. 844.  She explained that she had no warning prior to a seizure but she was aware of it because she would urinate the bed.  Tr. 844.  Trepes took Mestinon every 2 hours for her myasthenia gravis but did not take it at night.  Tr. 844.  She reported that she was able to sleep well at night; she recently went to the emergency room for shortness of breath and cough; she had not had any weight loss; she had double vision, drooping eyelids, generalized weakness, and she was restricted in her ability to walk distances because of her shortness of breath.  Tr. 844.  Dr. Kumar advised that, in addition to Trepes' usual course of Lamictal, it was reasonable to use low-dose Keppra for breakthrough seizures.  Tr. 845.  Dr. Kumar indicated that the breakthrough seizures may have occurred because of her recent systemic illness and the hope was that Trepes would be able to resume her usual monotherapy of Lamictal 200 mg twice per day once her bronchitis resolved.  Tr. 845.  Dr. Kumar also recommended that Trepes continue with Mestinon 30 mg every 2 hours while awake but noted that Trepes may want to discuss with Dr. Kurtz the possibility of using a long-acting Mestinon because it was difficult for Trepes to go without her Mestinon (except throughout the night) for more than 2 or 2.5 hours.  Tr. 845.

On November 3, 2013, Trepes sought emergency room treatment for her seizures.  Tr. 833-835.  She relayed that she had unwitnessed seizures while she was recently in the hospital and had experienced two more seizures – she had woken up again and urinated on herself.  Tr. 833.  Trepes could not describe the type of seizure disorder that she had but indicated it was related to her POTS.  Tr. 833.  The emergency room physician, Dr. Sandra Chisar, D.O., noted

that Trepes had not had any witnessed seizures while in the emergency room. Tr. 835. Dr. Kurtz noted that she had a discussion with Dr. Kurtz who informed Dr. Chisar that, until recent stressors, e.g., financial issues, recent hospitalization for bronchitis, and fighting for disability, Trepes' seizures had been under control. Tr. 835. Dr. Kurtz also advised that Trepes was scheduled to see her the following day and would check Trepes' Keppra levels. Tr. 835. Dr. Chisar discharged Trepes home in a stable condition. Tr. 835.

The following day, November 4, 2013, Trepes saw Dr. Kurtz. Tr. 883. Dr. Kurtz noted Trepes' recent hospital stay and visit. Tr. 883. Trepes requested that Dr. Kurtz provide her with a wheelchair prescription to use at home as needed. Tr. 883. Per Trepes' request, Dr. Kurtz provided Trepes with the wheelchair prescription. Tr. 883.

Trepes saw Dr. Deucher for a follow-up visit on November 26, 2013. Tr. 887-888. Dr. Deucher noted that Trepes was recently seen at the hospital for pneumonia and seizures; she had been placed on Keppra; she had ben diagnosed with chronic fatigue syndrome; her myasthenia was getting worse with muscle fatigue; she had not passed out since Halloween; her appetite was okay; she had not worked since December of the prior year; she had some pleuritis; and walking at been difficult at times. Tr. 887. Dr. Deucher concluded that Trepes' cardiac condition was stable. Tr. 888. He advised her to continue adequate hydration with water. Tr. 888.

Trepes saw Dr. Kurtz on December 18, 2013. Tr. 915. During that visit, Trepes indicated that every little thing wore her out; she was having more and more headaches; she had not had anymore seizures since Dr. Kurtz had started her on a new medication. Tr. 915. Trepes' headaches resolved with an injection but she would get another headache the next day. Tr. 915. Trepes was still not sleeping well – she was sleeping for three or four hours and waking for no

reason and then napping. Tr. 915. Dr. Kurtz noted that Trepes had not yet seen an eye doctor.

Tr. 915. Dr. Kurtz increased Trepes' Trazodone for her migraines and insomnia. Tr. 915.

During a February 12, 2014, visit with Dr. Kurtz, Trepes relayed that her headaches were

better – not as frequent. Tr. 916. Trepes was still reporting problems with her sleep. Tr. 916.

Trepes reported severe problems with depression, indicating that her mind would not shut down.

Tr. 916. Trepes had recently been seen by an eye doctor who found no problems with her eyes.

Tr. 916. Trepes had not had any more seizures and was doing okay with her current medications.

Tr. 916. Trepes' Paxil was increased for anxiety/depression and Dr. Kurtz recommended that

Trepes retry Melatonin with Trazodone for her insomnia. Tr. 916.

Trepes saw Dr. Deucher for follow up on March 5, 2014. Tr. 930-931. Trepes reported a

recent seizure and that her medicine for myasthenia gravis was increased. Tr. 930. Trepes' Paxil

had also been increased for depression. Tr. 931. Trepes had problems walking for any duration

and she was having some vision issues. Tr. 930. Dr. Deucher's physical examination findings

were unremarkable. Tr. 930-931. Dr. Deucher continued Trepes on Florinef. Tr. 931.

On April 28, 2014, Trepes saw Dr. Kurtz for a wheelchair assessment. Tr. 917. Dr.

Kurtz noted that insurance coverage had been denied and Trepes needed an assessment and

evaluation to determine medical necessity. Tr. 917. Dr. Kurtz stated that:

> [Trepes] requires [a] wheelchair due to myasthenia, scoliosis [and] [status-post] corrective surgery for scoliosis. [Patient] also has [additional] medical conditions which are confounding conditions including insomnia [and] anxiety, depression too, as well as migraine headaches. She also has underlying muscular dystrophy which causes muscular weakness with exertion and activity from the myasthenia gravis. It is medically necessary [for] Ms. Candice Trepes [to] have a wheelchair due to her multiple medical problems, specifically the two muscular disease[s] of myasthenia gravis [and] muscular dystrophy which is further complicated by chronic neck/back pain. Ms. Trepes requires a wheelchair due to muscular weakness [and] muscle fatigue with exertion due to her M-G (myasthenia gravis) [and] muscular dystrophy for which a wheelchair is medically necessary.

Tr 917. Trepes reported some small seizures at night but no incontinence. Tr. 918. Trepes was feeling weaker in her legs and having difficulty walking. Tr. 918. Trepes' last headache was about three weeks prior. Tr. 918. A few weeks prior, Trepes had the best sleep she had had in a while – sleeping for 9 hours. Tr. 918. Trepes reported being depressed, noting that her husband had recently lost his job. Tr. 918.

While being treated by Dr. Demangone, Trepes saw Dr. David Ryan, M.D., for a pain management consultation in May 2014. Tr. 908-914. Dr. Ryan reviewed Trepes' medical history, noting she had been treating with Dr. Demangone and was being treated with chronic opiate therapy. Tr. 913. Dr. Ryan noted that Trepes wanted to transfer her pain management care from Dr. Demangone due to the long drive to his office. Tr. 913. Dr. Ryan explained to Trepes that, if he took her on as a patient, it would be for the purpose of detoxification. Tr. 913. Considering Trepes' age of 35, Dr. Ryan did not feel it was sustainable for her to continue chronic opiate therapy. Tr. 914. Dr. Ryan suggested that Trepes think about his recommendations and, if she wanted to pursue the treatment plan he outlined, she should follow up with him. Tr. 914.

Upon Dr. Kurtz's referral, on July 7, 2014, Trepes saw rheumatologist Dr. Marie Kuchynski, M.D., (Tr. 896-907), for evaluation of diffuse muscle pain and possible fibromyalgia (Tr. 901). Dr. Kuchynski's musculoskeletal physical examination revealed "[p]alpation – 10/18 tender points tenderness, but no increased warmth, no masses, no clicks and no crepitus." Tr. 904. Dr. Kuchynski diagnosed myalgia. Tr. 904. Dr. Kuchynski suspected that fibromyalgia was the cause of Trepes' symptoms. Tr. 904. Dr. Kuchynski indicated that lab work would be done to rule out other causes. Tr. 904. Dr. Kuchynski noted that most treatments for fibromyalgia increased the risk of seizures so she would need to be watched closely. Tr. 904.

When Trepes saw Dr. Kurtz on January 9, 2015, Trepes reported that she was doing a lot of "jerking" while she was sleeping. Tr. 919. Trepes had not passed out or had any seizures. Tr. 919. Trepes was having trouble remembering things and she was still not sleeping well. Tr. 919.

Trepes saw Dr. Kuchynski for a follow up regarding fibromyalgia on February 12, 2015. Tr. 937-941. Trepes had tried Robaxin but reported that it did not help and she was having more diffuse pain and some hand pain. Tr. 937. Trepes' neck and back pain and fatigue were stable but she was having worsened myalgias, arthralgias, and diffuse pain. Tr. 937. Trepes reported having a seizure about two weeks prior and noted that her medication was being adjusted. Tr. 937. Dr. Kuchynski's musculoskeletal physical examination revealed "[p]alpation – 10/18 tender points tenderness, but no increased warmth, no masses, no clicks and no crepitus." Tr. 940. Dr. Kuchynski's diagnosis was fibromyalgia. Tr. 940. Dr. Kuchynski changed Trepes' muscle relaxer to see if it helped. Tr. 941.

Trepes saw Dr. Deucher for a follow-up visit on April 27, 2015. Tr. 1021-1022. Trepes reported having some seizures and noted that she was seen at the Cole Eye Institute and had a seizure while undergoing a test. Tr. 1021. Trepes had not had syncope. Tr. 1021. She had occasional palpitations for which she took an extra Metoprolol. Tr. 1021. Dr. Deucher found that Trepes' cardiac status was fair. Tr. 1022. He continued her medications. Tr. 1022.

On June 10, 2015, Trepes saw Dr. Elias Traboulsi, M.D., in the ophthalmology department at the Cleveland Clinic. Tr. 983-989. During the visit, an electroretinogram (ERG) was attempted but Trepes had a seizure in the exam room prior to the test starting. Tr. 983. Dr. Traboulsi's impression was that Trepes' vision problems and her neuromuscular problems were related but without the ability to obtain the ERG safely, Dr. Traboulsi indicated it was difficult to rule out a retinal cause. Tr. 987. Dr. Traboulsi recommended a second opinion from a

Cleveland Clinic neurologist to rule out underlying mitochondrial or other genetic etiology; a microperimetry to test for foveal sensitivity; and another ERG if necessary. Tr. 987. The primary encounter diagnosis from the visit was decreased vision in both eyes – congenital fibrosis syndrome of extraocular muscles. Tr. 988.

Trepes started seeing Dr. Abdallah Kabbara, M.D., for a pain management consultation on October 26, 2015. Tr. 1045-1047. Trepes relayed that she had left Dr. Demangone because he was no longer accepting her insurance. Tr. 1045. In recounting Trepes' medical history, Dr. Kabbara noted Trepes' surgery when she was 12 for scoliosis and cervical spine surgery in 2009. Tr. 1045. Trepes relayed that her neck pain returned following her cervical surgery. Tr. 1045. Trepes explained that her worst pain was in her neck that radiated down into her right shoulder and also pain around her thoracic spine area. Tr. 1045. Trepes had tried various treatments, including physical therapy, TENS unit, and injections without any significant improvement in Trepes' pain. Tr. 1045. Trepes was then started on opioid therapy and was maintained on Percocet which she was taking every three hours. Tr. 1045. Trepes relayed that the medication relieved her symptoms and allowed her to perform her daily activities. Tr. 1045. However, activity aggravated her pain. Tr. 1045. Dr. Kabbara noted that Trepes' seizures were under reasonable control with medication and she had been diagnosed with POTS, myasthenia gravis, chronic fatigue syndrome, fibromyalgia, chronic back pain, and restless leg syndrome. Tr. 1045. On physical examination, Dr. Kabbara observed that Trepes did not look to be in major distress; she did walk with an antalgic gait; there was soreness observed in the upper thoracic spine area down to the lumbar area with evidence of scoliosis and muscle spasms noted; range of motion of the cervical spine was limited; strength and reflexes in the upper extremities were symmetrical; and sensory examination of the upper extremities was preserved. Tr. 1046. Dr. Kabbara

recommended that Trepes switch from a short-acting to a long-acting opioid, which she had not yet tried.  Tr. 1046.  Dr. Kabbara's impression was cervical radiculopathy, status post-cervical fusion, and status-post Harringtons rods replacement for severe scoliosis.  Tr. 1046.  Dr. Kabbara noted that Trepes had an attachment to Percocet but she was willing to switch from a 5 mg dose, every 3 hours, to a 10 mg dose, every 6 hours.  Tr. 1046.

Dr. Kabbara continued to treat Trepes through at least August 2016 for management of her neck and back pain.  Tr. 1035-1044.  Dr. Kabbara continued Trepes on Percocet 10 mg, every 6 hours.  Tr. 1035-1044.  Trepes described her pain as reasonably under control with Percocet and physical examination findings were generally normal.  Tr. 1035-1044.

Trepes saw Dr. Deucher on October 27, 2015, for a follow-up visit.  Tr. 1019-1020. Trepes had been staying out of the hospital; her grand mal seizures were controlled but she was still having some seizures at night; Trepes had not passed out; she was having some palpitations; and she was seen at the Cole Eye Institute.  Tr. 1019.  Dr. Deucher found that Trepes' cardiac status was stable.  Tr. 1020.

On January 7, 2016, Trepes saw Dr. Marc D. Winkelman, M.D., with the muscle disease department at MetroHealth for evaluation of her myasthenia gravis.  Tr. 1057-1062.  On physical examination, Trepes could stand on her heels/toes but she was unable to rise from a chair with her hands.  Tr. 1060.  Dr. Winkelman's impression was bilateral ptosis and external ophthalmoplegia and bilateral limb weakness and blurry vision.  Tr. 1060.   He concluded that there had been no objective evidence of disease of visual pathways.  Tr. 1061.

*Mental health impairment treatment*

On June 18, 2015, Trepes saw Sandra Lavelle, CNP, for a psychiatric diagnostic evaluation.  Tr. 994-1001.  Trepes' chief complaint was difficulty falling and staying asleep.  Tr.

994. Her sleep difficulties had been ongoing for at least one year. Tr. 994. She also relayed that she had been experiencing depression sporadically for two years and she had been having anxiety. Tr. 994. Trepes had not had any prior counseling or hospitalizations. Tr. 994. Trepes' neurologist had suggested that her sleep issues might be stress related and she suggested that Trepes consider counseling. Tr. 994. Trepes reported having low energy; problems concentrating; crying spells; sporadic suicidal ideation but she had not acted on those thoughts; sporadic panic attacks; and racing thoughts. Tr. 998. Nurse Lavelle diagnosed major depressive disorder, single episode, severe without psychotic features, chronic and assigned a GAF score of 49.[4] Tr. 995. Trepes continued to see Nurse Lavelle for mental health treatment through at least September 2016. Tr. 1002-1007, 1088-1115.

In March 2016, Trepes relayed that she and her family had a nice getaway at a waterpark. Tr. 1091. She reported that her mood was better. Tr. 1091. She was still having problems sleeping but was working on arranging a sleep study. Tr. 1091. During a June 2016 session, Trepes relayed that she had been doing okay but indicated there were times when Xanax, which she took once every 10 days or so, was not strong enough. Tr. 1096. There were other days when .25 mg was fine. Tr. 1096. Trepes' diagnoses were major depressive disorder, single episode, severe psychotic features and insomnia, unspecified. Tr. 1096. Nurse Lavelle continued Trepes' medications, which included Xanax, Restoril, Paxil and Remeron. Tr. 1097.

---

[4] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

In early August 2016, Trepes reported increased crying and increased suicidal ideation. Tr. 1100. Nurse Lavelle added Vraylar to Trepes' medications. Tr. 1103. At a follow-up session in late August 2016, Trepes relayed that the Vraylar had helped reduce suicidal thoughts and crying spells. Tr. 1107. During a September 2016 session with Nurse Lavelle, Trepes continued to report that the medication was helping – she was having less crying spells and minimal suicidal thinking. Tr. 1113. Trepes relayed that she had a recent seizure. Tr. 1113. Her last grand mal seizure was one year prior but she still had petit mal seizures periodically. Tr. 1113. Trepes was planning on celebrating her birthday during the upcoming weekend with her husband, parents and cousins. Tr. 1113.

## 2. Opinion evidence

### *Physical impairment opinion evidence*

#### *Dr. Kurtz – treating provider*

On April 25, 2013, Dr. Kurtz completed a medical statement, indicating she first saw Trepes on May 2, 2007, and last saw her on March 25, 2013. Tr. 610-611. Dr. Kurtz stated that Trepes had been diagnosed with myasthenia gravis, seizure disorder, migraine headaches, POTS, probable hereditary muscular dystrophy, and cervical fusion surgery in 2009. Tr. 610. Dr. Kurtz explained that Trepes had myasthenia gravis since childhood which in recent years had caused fatigue with extended walking and standing. Tr. 610. Dr. Kurtz indicated that Trepes had impaired extraocular movement, bilateral ptosis (eyelid drooping) and facial weakness on May 2, 2007, to current. Tr. 610. Dr. Kurtz indicated that Trepes was taking a variety of medications, including Lamictal for seizures; Mestinon for myasthenia gravis; Paxil and Metoprolol for POTS; and Neurontin for neck pain. Tr. 611. Dr. Kurtz noted good compliance for all medications and indicated that Lamictal, Paxil and Metoprolol were effective; Mestinon was

mostly effective; and Neurontin was partially effective.  Tr. 611.  When asked to describe any limitations Trepes' impairments imposed on her ability to perform sustained work activity, Dr. Kurtz opined that "Mrs. Trepes has physical impairments and limitations due to her [myasthenia gravis] which include limited extended walking or extended standing as she has exertional fatigue with her [myasthenia gravis]."  Tr. 611.

On September 6, 2013, Dr. Kurtz completed a medical statement, indicating she first saw Trepes on May 2, 2007, and last saw her on July 24, 2013.  Tr. 803-804.  Dr. Kurtz's opinions were the same as those set forth in the April 25, 2013, statement.  *Compare* Tr. 803-804 *with* Tr. 610-611.

On November 4, 2013, Dr. Kurtz completed a Medical Source Statement: Patient's Physical Capacity.  Tr. 880-881.  Dr. Kurtz opined that Trepes had limitations caused by her impairments.  Tr. 880-881.  She opined that Trepes was (1) limited to lifting/carrying 10 pounds occasionally and less than 5 pounds frequently due to chronic neck pain scoliosis, with corrective surgery; (2) limited to standing/walking for a total of 2.5 hours and for 15 minutes without interruption due to myasthenia gravis; and (3) limited to sitting for a total of 2.5 hours and for 30 minutes without interruption due to chronic neck pain and scoliosis.  Tr. 880.  Dr. Kurtz opined that Trepes could climb, balance, stoop, crouch, kneel and crawl rarely due to myasthenia gravis, neck pain and scoliosis.  Tr. 880.  Dr. Kurtz opined that Trepes was limited to occasional reaching, pushing/pulling, performing fine manipulation and performing gross manipulation due to myasthenia gravis, neck pain and scoliosis.  Tr. 881.  Dr. Kurtz opined that due to migraine headaches and seizure disorder Trepes had the following environmental limitations – heights, moving machinery, temperature extremes, pulmonary irritants, and noise.  Tr. 881.  Dr. Kurtz indicated that none of the following had been prescribed for Trepes – cane, walker, brace, TENS

unit, breathing machine, oxygen, or wheelchair. Tr. 881. Trepes would need to be able to alternate positions between sitting, standing, and walking at will. Tr. 881. Dr. Kurtz indicated that Trepes experienced moderate pain and her pain would interfere with her ability to concentrate, would cause her to be off task and would cause absenteeism. Tr. 881. Trepes would not need to elevate her legs at will. Tr. 881. Trepes would require additional unscheduled rest periods for an average of 3-4 hours during an 8-hour workday outside of a standard half hour lunch and two 15-minute breaks. Tr. 881. Dr. Kurtz further explained that Trepes suffered from seizure disorder that would interfere with work 8 hours a day, 5 days a week. Tr. 881.

On August 29, 2016, Dr. Kurtz completed a Medical Source Statement: Patient's Physical Capacity. Tr. 1025-1026. Dr. Kurtz opined that Trepes had limitations caused by her impairments. Tr. 1025-1026. She opined that Trepes was (1) limited to lifting/carrying less than 10 pounds occasionally and less than 5 pounds frequently due to myasthenia gravis and fibromyalgia; (2) limited to standing/walking for a total of 1-2 hours and for 30 minutes without interruption due to myasthenia gravis and fibromyalgia; and (3) limited to sitting for a total of 2-3 hours and for less than 1 hour without interruption due to myasthenia gravis and fibromyalgia. Tr. 1025. Dr. Kurtz opined that Trepes could climb, balance, stoop, crouch, kneel and crawl rarely due to myasthenia gravis and fibromyalgia. Tr. 1025. Dr. Kurtz opined that Trepes could rarely reach, push/pull, perform fine manipulation and perform gross manipulation due to myasthenia gravis and fibromyalgia. Tr. 1026. Dr. Kurtz opined that, due to seizure disorder, Trepes had the following environmental limitations – heights, moving machinery, temperature extremes, pulmonary irritants, and noise. Tr. 1026. Dr. Kurtz indicated that none of the following had been prescribed for Trepes – cane, walker, brace, TENS unit, breathing machine, oxygen, or wheelchair. Tr. 1026. Trepes would need to be able to alternate positions between

sitting, standing, and walking at will. Tr. 1026. Dr. Kurtz indicated that Trepes experienced moderate pain and her pain would interfere with her ability to concentrate, would cause her to be off task and would cause absenteeism. Tr. 1026. Trepes would not need to elevate her legs at will. Tr. 1026. Trepes would require additional unscheduled rest periods for an average of 2-3 hours during an 8-hour workday outside of a standard half hour lunch and two 15-minute breaks. Tr. 1026. Dr. Kurtz further explained that Trepes had exertional fatigue secondary to myasthenia gravis that would interfere with work 8 hours a day, 5 days a week. Tr. 1026.

### *Drs. Torello and Villanueva – state agency reviewers*

On May 16, 2013, state agency reviewing physician Dr. Lynne Torello, M.D., completed a Physical RFC Assessment. Tr. 126-129. Dr. Torello opined that Trepes had the RFC to lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for a total of 2 hours; sit for a total of 6 hours in an 8-hour workday; and occasionally push and/or pull with bilateral upper extremities due to history of Harrington rods and myasthenia gravis with muscle weakness; no climbing ladders/ropes/scaffolds; occasional climbing ramps/stairs, stooping, kneeling, crouching, and crawling and frequent balancing due to muscle weakness; overhead reaching limited bilaterally to occasional due to cervical degenerative disc disease; limited to frequent visual activities due to impaired extraocular movement and bilateral ptosis from myasthenia; and no exposure to hazardous machinery, unprotected heights and commercial driving due to myasthenia gravis. Tr. 126-129.

Upon reconsideration, on November 30, 2013, state agency reviewing physician Dr. Esberdado Villanueva, M.D., completed a Physical RFC Assessment. Tr. 144-147. Dr. Villanueva reached the same opinions as Dr. Torello except Dr. Villanueva found that Trepes could occasionally balance rather than frequently balance. Tr. 144-147.

*Nurse Lavelle – treating provider*

On August 23, 2016, Nurse Lavelle completed a Medical Source Statement: Patient's Mental Capacity.[5]  Tr. 1023-1024.  Nurse Lavelle noted that Trepes had started counseling and psychiatry services on April 8, 2015.  Tr. 1024.  Nurse Lavelle opined that Trepes had an unlimited ability to follow work rules; use judgment; respond appropriately to changes in routine settings; relate to coworkers; interact with supervisors; work in coordination with or proximity to others without being distracting; maintain appearance; and manage funds/schedules.  Tr. 1023-1024.  Nurse Lavelle opined that Trepes could frequently (up to two-thirds of the workday) socialize; relate predictably in social situations; and leave her own home.  Tr. 1024.  Nurse Lavelle opined that Trepes could occasionally (up to one-third of the workday) maintain attention and concentration for extended periods of 2 hour segments; deal with the public; function independently without redirection; work in coordination with or proximity to others without being distracted; understand, remember and carry out complex job instructions; understand, remember and carry out detailed but not complex job instructions; understand, remember and carry out simple job instructions; and behave in an emotionally stable manner. Tr. 1023-1024.  Nurse Lavelle opined that Trepes could rarely maintain regular attendance and be punctual within customary tolerance; deal with work stress; and complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 1023.  Nurse Lavelle explained that the following diagnoses and symptoms supported her assessment – major depressive disorder; insomnia; forgetfulness; difficulty concentrating; impatience at times;

---

[5] The statement was also signed by Jodie Fine, M.Ed., PCC-S.  Tr. 1024.

frequent crying spells; severe sleep impairment leading to fatigue and need to nap during the day; and isolating at times. Tr. 1024.

### *Dr. Dubro – consultative examiner*

On June 24, 2013, Dr. Alan Dubro, Ph.D., conducted a psychological evaluation. Tr. 737-743. Trepes reported that she had cognitive difficulties associated with ongoing medical problems. Tr. 737. Trepes relayed that, along with not feeling physically well, at times her mood was depressed but she was not constantly depressed. Tr. 740, 742. Dr. Dubro diagnosed adjustment disorder with depressed mood and assigned a GAF score of 50. Tr. 741. Dr. Dubro opined that Trepes was able to understand, remember and carry out instructions; she was able to maintain her attention span and concentration but tended to fatigue easily so she paces herself and is able to work through to completion on tasks; she has performed simple tasks independently and on a regular basis; she has performed complex tasks but has difficulty with muscular weakness so she has received assistance from her husband with carrying and lifting items; she has no problem getting along with other people; and, notwithstanding her ongoing medical problems, Trepes has always been able to handle stressors that have arisen at work. Tr. 743.

### *Drs. Rudy and Demuth – state agency reviewers*

On July 9, 2013, state agency reviewing psychologist Leslie Rudy, Ph.D., opined that Trepes' psychological condition was non-severe. Tr. 125. Dr. Rudy noted that Trepes had not alleged a psychological condition but there was medical evidence of record indicating that she had problems with remembering and focus. Tr. 125. Dr. Rudy also noted that a consultative evaluation had been performed. Tr. 125. Having reviewed the records, Dr. Rudy concluded that Trepes' affective disorder resulted in no restriction of activities of daily living, no difficulties in

maintaining social functioning, no repeated episodes of decompensation, each of extended duration, and no more than mild difficulties in maintaining concentration, persistence or pace. Tr. 125.

Upon reconsideration, on November 27, 2013, state agency reviewing psychologist Dr. David Demuth, M.D., reached the same conclusion as Dr. Rudy, i.e., psychological condition was non-severe. Tr. 143.

## C.     Hearing testimony

### 1.     Plaintiff's testimony

Trepes testified and was represented at both hearings. Tr. 49-58, 76, 80-82, 93-109.

*April 2015 hearing*

Trepes discussed her various medical conditions. Tr. 96-98. She explained she feels tired and weak all over and starts to get sleepy. Tr. 96. She takes medication to control her POTS' symptoms, i.e., to help regulate her heart rate. Tr. 97-98. Trepes indicated she felt that her POTS was stable. Tr. 107.

Trepes' myasthenia gravis – which she has had since birth – causes fatigue. Tr. 98, 107. Trepes has seizures, which started in 2006 or 2007 – usually a grand mal seizure every couple of months and other seizures several times each week while she is sleeping. Tr. 98. Trepes loses control of her bowel and bladder when having a seizure. Tr. 106. She takes two different medications for her seizures which cause her to feel foggy and cause concentration problems. Tr. 106. Trepes indicated that her seizures and myasthenia gravis have impacted her ability to work at times. Tr. 99. Trepes feels that her myasthenia and seizures have gotten worse over time. Tr. 107. She explained that her myasthenia has impacted her ability to do a lot of walking or stairs. Tr. 99.

Trepes has migraine headaches, which she estimated occurred a couple of times each week. Tr. 99. However, Trepes relayed that her migraines had not been as bad over the prior months – maybe only one or two over the prior couple months. Tr. 99. She was using injections at the onset of a migraine. Tr. 99. Trepes has problems with her vision. Tr. 99. She used to have normal vision but now has blurry vision most of the time and sometimes she has double vision. Tr. 99. It is difficult for Trepes to read. Tr. 100-101. Trepes was planning on following up with an eye specialist to see if the vision problems could be corrected. Tr. 100. She was waiting for an appointment. Tr. 100.

When Trepes was 12 years old she had back surgery due to scoliosis. Tr. 103. Unrelated to the scoliosis surgery, in 2009, Trepes had surgery on her neck. Tr. 103-104. Following the 2009 surgery, Trepes continued to have pain in the right side of her neck that went down into her shoulder and arm. Tr. 104. She has tried injections but the injections have not worked. Tr. 104. Trepes is right-handed. Tr. 104. She has a tendency to drop things with her right dominant arm. Tr. 104. For example, she has dropped a can of soda on occasion. Tr. 104. She has gone to a pain management doctor and consulted with the surgeon that performed her neck surgery and both have indicated that nothing further can be done, either surgically or with injections, that will provide Trepes with relief. Tr. 104. She takes pain medication. Tr. 104. She noted she no longer has side effects from the pain medication, noting she had been taking pain medication for years. Tr. 104-105. Trepes explained that her pain is normally dull and achy. Tr. 105. However, at times, it is sharp and feels like a stabbing kind of pain. Tr. 105. She rated her pain a 5 or 6 out of 10 on a good day, with 10 being the worst. Tr. 105. Trepes indicated she had bad days at least a couple of times each week. Tr. 105. A bad day involved increased pain and usually being in bed all day. Tr. 105. Trepes indicated she was unable to turn her head all the

way to a 90 degree angle, side to side.  Tr. 106.  Also, because of her myasthenia gravis, she is

unable to look up and down because her eye does not look up – her range is limited.  Tr. 106.

Trepes indicated she has also been diagnosed with fibromyalgia and chronic fatigue

syndrome.  Tr. 107.  She relayed that her fibromyalgia causes her problems with her joints,

especially in her hands and feet where they are stiff.  Tr. 108.  It is hard for Trepes to move and

walk sometimes and, when she wakes up in the morning, she is really stiff and it is hard for her

to get up.  Tr. 108.

Trepes indicated she was scheduled for a first visit with a psychologist or psychiatrist the

day after the April 2015 hearing.  Tr. 101.  Trepes' neurologist had suggested that she see a

mental health provider because she had been having a lot of sleep issues.  Tr. 101.  Trepes also

indicated she had had problems with depression off and on for the last couple of years.  Tr. 101.

Trepes was taking Paxil for her depression which she felt helped most of the time.  Tr. 101-102.

Trepes did not think she would have problems getting along with other people at a job.  Tr. 102.

She felt she might have problems learning a job because she has problems remembering things

sometimes.  Tr. 102.

Trepes relayed that she had not driven in two years due to a combination of her vision

problems and seizures.  Tr. 100.  Trepes weighed 108 pounds at the hearing.  Tr. 102.  Before

getting sick in 2012, Trepes weighed 130 pounds.  Tr. 102.  Her weight then dropped to 94

pounds.  Tr. 102.  Trepes indicated that her doctors told her that the weight loss was related to

her POTS because her heart was racing so much – it was overworking and burning calories.  Tr.

102-103.

Trepes indicated that she and her husband moved in with her mother in her mother's

apartment so that she would have someone else around.  Tr. 103.  Her mother helps with the

housework and drives Trepes where she needs to go. Tr. 103. Trepes has a stool in the shower because she cannot stand very long. Tr. 103. Also, because of her seizures, she only takes a shower when someone else is at home. Tr. 103.

*November 2016 hearing*

The ALJ asked Trepes whether there had been any changes in her conditions since the prior hearing. Tr. 50. In response, Trepes indicated that her fibromyalgia, myasthenia gravis, migraines, seizures and depression had worsened. Tr. 50-51.

Trepes' last grand mal seizure was back in April 2016 but she was having seizures almost every night in her sleep. Tr. 51. She usually sleeps through her seizures but her husband relays to her that he wakes up and has to hold on to her and put her on her side so she does not fall out of the bed. Tr. 51. After having a seizure, Trepes feels more fatigued and she usually has bitten her tongue, cheek or lip. Tr. 51. Trepes takes two medications for her seizures. Tr. 51. Because her grand mal seizures have subsided she feels her medications are helping but she is still getting seizures at night. Tr. 51.

Trepes' migraines had improved a little but during the prior month she had a migraine four days in one week. Tr. 51-52. Trepes has medication, in the form of an injection, that she takes at the onset of a migraine. Tr. 52. The injection helps with the migraine but, after taking it, she usually sleeps for the remainder of the day. Tr. 52.

Trepes' depression was worse. Tr. 53. In January of 2016, Trepes had gotten so depressed that she wanted to end things. Tr. 53. Trepes started seeing a counselor sometime during 2015 (Tr. 56) and was seeing a psychologist every week and her psychiatrist every four to six weeks (Tr. 53). She had been taking Paxil in January. Tr. 53. Her doctor added Xanax,

started to slowly increase her Paxil, and added a mood stabilizer.[6]  Tr. 53.  The medications that Trepes takes for her mental health impairments make her feel like her head is in a fog and she is unable to concentrate and do anything.  Tr. 53.

Trepes' fibromyalgia had also gotten worse.  Tr. 57-58.  She indicated that, over the prior six months, she was progressively having more problems with her hands.  Tr. 58.  Her hands were becoming stiff and she was starting to lose her grip on things.  Tr. 58.  Trepes also has pain in her legs and in her back from her fibromyalgia.  Tr. 58.

Trepes felt she would have a problem learning how to do a job because she has a hard time staying focused on something.  Tr. 54.  Trepes did not think she would have a problem getting along with others at work.  Tr. 54.  Trepes estimated being able to stand in place for about a half-hour at most.  Tr. 55.  After standing for that amount of time, Trepes has to sit or lie down.  Tr. 55.  Depending on the kind of day Trepes is having, the amount of time she has to sit before she can stand back up varies.  Tr. 55.  Because of her standing limitations, Trepes has a hard time standing to cook something or taking a shower.  Tr. 55.  She has a stool in the bathtub because she is unable to stand to take a shower.  Tr. 55.  Walking is usually worse than standing, if it is for a long period of time or distance.  Tr. 55.  Trepes can sit for about a half hour before she has to get up and stand, walk around, or lie down for about five or ten minutes.  Tr. 55-56.  Trepes does not think she can lift much weight and she noted that her doctors have advised her not to lift more than five or ten pounds.  Tr. 56.  Trepes estimated that about half of the days during the prior month were bad days.  Tr. 56.

Because of all her medications as well as her depression, Trepes has a hard time falling asleep and staying asleep.  Tr. 57.   Once Trepes is able to fall asleep, she usually sleeps for

---

[6] Trepes could not recall the name of the mood stabilizer that her doctor had prescribed.  Tr. 53.

blocks of about one or two hours and then wakes up for a while before she falls back to sleep. Tr. 57. Notwithstanding the amount of sleep that Trepes gets at night, she naps on a regular basis during the day for about one or two hours. Tr. 57.

### 2. Medical expert's testimony

Dr. Diana Jo-Chien Pi, M.D., testified at the November 10, 2016, hearing as a Medical Expert. Tr. 58-77, 1027-1030. Dr. Pi opined that Trepes had three major physical impairments – myasthenia gravis (evaluated by Dr. Pi under Listing 11.12); grand mal seizures (evaluated by Dr. Pi under Listing 11.02); and POTS (evaluated by Dr. Pi under Listing 4.05 (cardiology, arrhythmia equivalent). Tr. 60. Dr. Pi opined that fibromyalgia and migraines could be folded into the three major diagnoses of myasthenia gravis, grand mal seizures, and POTS. Tr. 60. While noting that she did not specialize in psychology, Dr. Pi indicated she had reviewed the records regarding Trepes' depression and anxiety, including medical treatment records and evaluations, and Dr. Pi took into account what the medical providers said when assessing Trepes' limitations relating to her neurological issues. Tr. 61.

Dr. Pi opined that, based on Trepes' medical records, Trepes' impairments alone or in combination did not meet or medically equal any of the Listings. Tr. 61. Dr. Pi noted that, based only on Trepes' testimony regarding the number and frequency of her night seizures, her impairment would satisfy the listing which requires more than one seizure per month for three consecutive months. Tr. 63-66. However, Dr. Pi observed that, other than one witnessed seizure that occurred while she was having testing done on her eyes, there were no other seizures described by anyone other than Trepes herself. Tr. 64.

The ALJ asked Dr. Pi whether she would expect Trepes to have functional limitations due to her impairments. Tr. 66-67. Dr. Pi responded yes, opining that Trepes would be limited

to sedentary level work.  Tr. 67.  Dr. Pi explained more fully that Trepes could lift and carry up to 10 pounds occasionally; she could sit for 6 hours; she could stand/walk for 2 hours; she would not need a cane to ambulate; she could frequently reach, handle, finger, feel, push and pull with her arms bilaterally; she had no limitations with her feet; she should avoid fast-paced work; she could occasionally climb ramps, stoop, kneel, crouch, and crawl; she could never climb ladders or scaffolds; she had no balance limitations; she had no problem hearing; she had no visual limitations;[7] she should never be around unprotected heights, moving mechanical parts, or operating a motor vehicle.  Tr. 68.  Dr. Pi did not think that Trepes would be off task during the day for any length of time.  Tr. 69.

During Dr. Pi's testimony, Trepes' counsel referenced one of Dr. Kurtz's medical records from April 2014 that indicated a wheelchair was medically necessary.  Tr. 77.  Counsel for Trepes added that Trepes had informed her that she only uses the wheelchair about four times a year.  Tr. 77.  Dr. Pi noted that she was aware of that treatment note and observed that Dr. Kurtz had included a new diagnosis of muscular dystrophy, which Trepes had never had.  Tr. 77.

### 3.    Vocational expert's testimony

Following the Appeals Council's remand order, Vocational Expert Bruce Holderead ("VE") testified at the November 10, 2016, hearing.[8]  Tr.  78-80, 82-87.  After seeking clarification from Trepes regarding her job duties while working at Sears, the VE testified that Trepes past work was a composite job – repair-order clerk (semi-skilled) and customer-

---

[7] Dr. Pi noted that Trepes had undergone very extensive eye examinations but they were unable to find "any physical thing wrong with this blurred vision[]" and "her blurred vision never influenced her walking[]" so Dr. Pi did not include visual restrictions.  Tr. 67-68.

[8] Brett Salkin provided vocational expert testimony at the April 7, 2015, hearing.  Tr. 109-116.

complaint clerk (skilled), both sedentary level jobs that were performed by Trepes at the light level.  Tr. 80-84.

For his first hypothetical, the ALJ asked the VE to assume a hypothetical individual with the past work as described who is capable of sedentary work and who can occasionally push or pull with bilateral upper extremities; can occasionally climb ramps or stairs; can never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch or crawl; can occasionally reach overhead and frequently reach in other directions with bilateral upper extremities; can frequently handle, finger and feel bilaterally; cannot perform close reading; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; and can perform goal-oriented work but cannot work at a production rate pace.  Tr. 84-85.  The VE indicated that the described individual would be able to perform Trepes' past work as a customer-complaint clerk and repair-order clerk.  Tr. 84-85.  The VE also indicated that there would be other jobs available to the individual described in the first hypothetical (with the goal-oriented work limitation), including addresser; document preparer; and order clerk (food and beverage).[9]  Tr. 86.

For his second hypothetical, the ALJ asked the VE to assume the individual described in the first hypothetical except that the individual can perform simple tasks in a work setting with occasional changes.  Tr. 86.  The VE indicated that the described individual would be unable to perform Trepes' past work.  Tr. 86.  The other jobs listed in response to the first hypothetical would remain available to the individual described in the second hypothetical.  Tr. 86.

---

[9] The VE provided national job incidence data for the identified jobs.  Tr. 86.

For his third hypothetical, the ALJ asked the VE to consider an individual who is off-task 20% of the time. Tr. 86. The VE indicated that the described individual would be unable to perform Trepes' past work as well as any other work in the economy. Tr. 86-87.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107

S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In his December 5, 2016, decision, the ALJ made the following findings:[10]

1.     Trepes meets the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 20.

2.     Trepes has not engaged in substantial gainful activity since December 13, 2012, the alleged onset date.  Tr. 20.

3.     Trepes has the following severe impairments: myasthenia gravis; grand mal seizures; POTS, and spine disorder.  Tr. 20-21.  Trepes' depression is a non-severe impairment.  Tr. 21-22.  Since the medical expert testified that Trepes' fibromyalgia and migraine headaches could be folded into the greater neurological conditions of myasthenia gravis and POTS, fibromyalgia and migraine headaches need not be considered separate severe physical impairments.  Tr. 23.

4.     Trepes does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 24.

5.     Trepes has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she can occasionally push or pull with the bilateral upper extremities; she can occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; and occasionally balance, stoop, kneel, crouch,

---

[10] The ALJ's findings are summarized.

or crawl; she can occasionally reach overhead and frequently reach in all other directions bilaterally; she can frequently handle, finger and feel bilaterally; she cannot perform close reading; she must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; she can perform goal-oriented work but cannot work at a production rate pace. Tr. 24-34.

6. Trepes is capable of performing her past relevant work as a repair-order clerk and customer-complaint clerk as they are generally performed. Tr. 34.

Based on the foregoing, the ALJ determined that Trepes had not been under a disability, as defined in the Social Security Act, from December 13, 2012, through the date of the decision. Tr. 35.

## V. Plaintiff's Arguments

Trepes argues that the RFC is not supported by substantial evidence because the ALJ improperly weighed and evaluated opinions rendered by her treating neurologist Dr. Kurtz and treating mental health provider Nurse Lavelle. She also argues that the ALJ failed to properly consider her subjective allegations and symptoms caused by Trepes' severe and non-severe medically determinable impairments.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## A.      The ALJ did not err in weighing the opinion evidence

Trepes argues that the ALJ did not properly weigh the opinions rendered by her treating neurologist Dr. Kurtz and the opinion of Nurse Lavelle who Trepes saw for her mental health impairments.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the

weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

*Dr. Kurtz*

Trepes argues that the ALJ erred in assigning only partial weight to Dr. Kurtz's November 4, 2013, opinion and her August 29, 2016, opinion.[11] After detailing the functional limitations contained in each of the opinions (Tr. 32-33), the ALJ explained the weight he assigned to them stating:

> The undersigned gives these opinions partial weight, as there were based on an extensive treating relationship and are somewhat supported by the foregoing evidence of pain, tenderness, weakness, fatigue, and occasional gait abnormalities (Exhibit 1F, 2F, 3F, 6F, 7F, 8F, 9F, 10F, 11F, 12F, 16F, 17F, 18F, 19F, 20F, 21F, 23F, 24F, 25F, 26F, 27F, 28F, 29F, 30F, 31F, 33F, 34F, 37F, 40F, 41F, 45F, 46F).

---

[11] As reflected in the decision, the ALJ assigned great weight to Dr. Kurtz's April and September 2013 opinions that Trepes' myasthenia gravis with exertional fatigue caused limited extended walking or standing. Tr. 32, 611, 672, 804, 810. Trepes refers to these opinions but does not specifically challenge the ALJ's weighing of these two opinions. However, she asserts that the ALJ assigned great weight to opinions that he found to be somewhat vague but only partial weight to other opinions rendered by Dr. Kurtz that contained greater detail.

However, some of the restrictions, including the need for daily rest periods, are inconsistent with the record as a whole, including Dr. Kurtz's own generally unremarkable treatment notes (Exhibit 8F, 10F, 17F, 18F, 23F, 29F). As a result, the undersigned gives these opinions partial as opposed to great or controlling weight.

Tr. 33.

Trepes contends that the ALJ's assignment of only partial weight was error because the evidence is consistent with Dr. Kurtz's opinion. Trepes proceeds to discuss evidence relating to her medical conditions, including muscle fatigue and weakness, lightheadedness, migraines, seizures, and argues that such evidence is consistent with Dr. Kurtz's opinions. For example, she argues that Trepes' muscle weakness and fatigue is why Dr. Kurtz ordered a wheelchair. However, the ALJ considered Dr. Kurtz's statements regarding the need for a wheelchair but considered that evidence not in isolation but along with the other evidence of record, which included Trepes' cardiologist indicating Trepes could try to return to work at Sears and her pain management physician consistently noting that Trepes' medications allowed her to perform her activities of daily living. Tr. 27. Further, while Dr. Kurtz's treatment notes from April 28, 2014, indicate that a wheelchair was medically necessary (Tr. 27, 917), Dr. Kurtz's opinions, dated November 4, 2013, (Tr. 880-881) and August 29, 2016, (Tr. 1025-1026), both indicate that a wheelchair was never prescribed. Also, during the hearing it was noted that Trepes had informed her counsel that she only used the wheelchair about four times a year. Tr. 77.

Additionally, the ALJ considered in detail evidence relating to all of Trepes' alleged conditions and symptoms yet found the evidence did not support Dr. Kurtz's more restrictive limitations, including the need for rest periods throughout an 8-hour workday for an average of 2-4 hours. It is not for this court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. And, even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Trepes has not shown that the ALJ's decision to assign partial weight to Dr. Kurtz's November 3, 2013, and August 29, 2016, opinions is not supported by substantial evidence.

Trepes also argues that the ALJ's assessment of Dr. Kurtz's opinions was in error because the ALJ did not fully understand Trepes' conditions, particularly POTS and myasthenia gravis. Trepes' argument in this regard is conclusory and without merit. The ALJ heard testimony from a medical expert, Dr. Pi, who considered the diagnoses of both POTS and myasthenia gravis and evidence relating thereto along with evidence relating to Trepes' seizure disorder and evidence relating to fibromyalgia and migraines. Tr. 60-61. The ALJ assigned partial weight to Dr. Pi's opinion that Trepes retained the RFC to perform sedentary work with some additional limitations as noted in her opinion. Tr. 33. Additionally, during Dr. Pi's expert testimony, Dr. Pi testified that she did not see any reason that Trepes would be off-task during the day or that her conditions would cause absenteeism. Tr. 69-70. Also, Dr. Pi was asked specifically about Dr Kurtz's opinion that Trepes would require additional breaks. Tr. 73. In response, Dr. Pi noted she had read through Dr. Kurtz's records and observed that Dr. Kurtz felt that Trepes' seizures were under control, her migraines were getting better, and the myasthenia was very stable. Tr. 73-74. The ALJ considered Dr. Pi's opinion, noting that Dr. Pi indicated there would be no off task or absenteeism. Tr. 26, 69-70.

The Court finds that the ALJ sufficiently complied with the treating physician rule when considering and weighing the various opinions rendered by Dr. Kurtz and Trepes has not shown that the ALJ's assessment of Dr. Kurtz's opinions is not supported by substantial evidence.

*Nurse Lavelle*

Trepes also challenges the weight the ALJ assigned to the opinion rendered by Nurse

Lavelle.  After discussing the details of Nurse Lavelle's August 23, 2016, opinion, the ALJ

explained the weight he assigned to her opinion, stating:

> Although Ms. Lavelle has a treating relationship with the claimant, she is not an acceptable medical source as defined by the Social Security Administration regulations.  Furthermore, her opinion is contradicted by the record as a whole, which indicates generally mild psychiatric abnormalities on examination, despite rather conservative treatment (Exhibit 13F, 39F, 47F).  As a result, the undersigned gives the opinion partial, as opposed to great or controlling weight.

Tr. 22.

As Trepes acknowledges, the ALJ correctly noted that Nurse Lavelle was not an

acceptable medical source. *See* 20 C.F.R. § 404.1513 (indicating not all medical sources are

acceptable medical sources).[12]  For example, nurse practitioners and therapists are medical

sources but they are not considered "acceptable medical sources."  20 C.F.R. § 404.1513(d).

However, the opinion of a medical source who is not an "acceptable medical source" who has

seen a claimant in her professional capacity is relevant evidence.  SSR 06-03p, 2006 WL

2329939, * 6 (August 9, 2006).   SSR 06-03p provides guidance as to how opinions of medical

sources who are not "acceptable medical sources" are to be considered, stating,

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

> Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

---

[12] Since Trepes' claim was filed prior to March 26, 2017, the version of 20 C.F.R. § 404.1513 effective from September 3, 2013, to March 26, 2017, is the applicable version of the Regulation.

SSR 06-03p, 2006 WL 2329939, * 5.

Here, although not an acceptable medical source, consistent with the Regulations and SSR 06-03p, the ALJ considered Nurse Lavelle's opinions.

Trepes initially contends that the ALJ's assignment of partial weight to Nurse Lavelle's opinion contradicts the ALJ's finding that Trepes' mental health impairments were non-severe. The two findings are not contradictory. The ALJ considered the opinion evidence when assessing the severity of Trepes' mental health impairments and weighed that evidence along with other evidence of record regarding her mental health impairments. In weighing the evidence, the ALJ found and fully explained his bases for finding no severe mental health impairment. As the ALJ explained, the ALJ found no limitation in activities of daily living, no limitation in social functioning, only a mild limitation in concentration, persistence or pace, and no episodes of decompensation, each of an extended duration. Tr. 22. Trepes has not shown that these findings are unsupported by substantial evidence or that the ALJ erred in finding her mental health impairments to be non-severe.

Trepes' argument that the ALJ erred by considering opinions offered by the consultative examiner and the state agency reviewing psychologists and assigning greater weight to those opinions than to Nurse Lavelle's because those opinions were rendered before she started mental health treatment is unavailing. Trepes claimed a disability onset date of December 13, 2012. Dr. Dubro evaluated Trepes and rendered his opinion in June 2013 and the state agency reviewing psychologists rendered their opinions in July 2013 and November 2013. Tr. 125, 143, 737. While the opinions were rendered prior to the time Trepes started mental health treatment, the opinions nevertheless pertain to the relevant period of time for which Trepes was seeking a

finding of disability.  Thus, it was not error for the ALJ to consider or assign great weight to those opinions.

Trepes also takes issue with the ALJ's finding that Nurse Lavelle's opinion is contradicted by the record as a whole, which indicates generally mild psychiatric abnormalities and rather conservative treatment.  She points to various records in support of her claim that the ALJ incorrectly concluded that the record indicated generally mild psychiatric abnormalities and rather conservative treatment.  For example, she points to examination findings showing a tired mood, sad affect, moderately impaired recent memory, and distractible attention and concentration.  The ALJ, however, considered this evidence along with other evidence including the types of medications used to treat her mental health impairment and improvement with medication.  Tr. 21.  The ALJ also considered Trepes' limited mental health treatment record as well as the opinions of the consultative examiner and state agency reviewing psychologists.  Thus, while Trepes disagrees with the ALJ's weighing of the evidence, she has not shown that the ALJ ignored evidence.  Here, the ALJ fully considered and weighed the evidence.  It is not for this court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

The Court finds that the ALJ properly considered and weighed the opinion of Nurse Lavelle and Trepes has not shown that the ALJ's assessment of her opinion is not supported by substantial evidence.

**B.      The ALJ did not err in evaluating Trepes' symptoms**

In challenging the ALJ's consideration of her symptoms, Trepes contends that the ALJ erred in finding that fibromyalgia was non-severe.  She also argues that the ALJ did not properly evaluate her symptoms, including side effects from medication, such as fatigue.

A diagnosis of fibromyalgia does not in itself entitle a claimant to disability. *See Stankoski v. Astrue*, 532 Fed. Appx. 614, 619 (6th Cir. 2013) (citing *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. 2008)). Although the ALJ did not find fibromyalgia to be a separate severe physical impairment, the ALJ considered Dr. Pi's medical opinion that Trepes' fibromyalgia along with her migraine headaches were folded into the greater neurological conditions of myasthenia gravis and POTS. Tr. 23. Thus, it is clear that the ALJ considered fibromyalgia when assessing Trepes' disability claim.

Trepes takes issue with the ALJ's assessment of her symptoms. A claimant's statements of symptoms are not sufficient alone to establish the existence of a physical or mental impairment or disability. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.[13] When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.[14] 20 C.F.R. § 404.1529(c); 2017 WL 5180304, * 2-8. "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless,

---

[13] SSR 16-3p replaces SSR 96-7p and applies to rulings on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13.

[14] First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain. SSR 16-3p, 2017 WL 5180304, * 3-4. Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id.* at * 3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. SSR 16-3p, 2017 WL 5180304, * 5-8. In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered. *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at * 10.

an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Contrary to Trepes' suggestion, the ALJ did not only consider objective evidence. The ALJ considered Trepes' subjective allegations regarding her symptoms, including side effects from medications. For example, the ALJ noted that Trepes' headache medication helps with the headaches but then causes her to sleep the balance of the day. Tr. 25. Also, the ALJ considered Trepes' reports of other medication side effects, including constant tiredness, weakness, and feeling like her head is in a fog. Tr. 25. The ALJ also considered Trepes' reports that she naps for 1-2 hours each day because of poor sleep at night. Tr. 25. Furthermore, following a detailed discussion of the evidence, the ALJ explained his reasons for finding Trepes' statements regarding the limiting effects of her symptoms not entirely consistent with the record. Tr. 31-32. The ALJ discussed and considered evidence regarding Trepes' activities of daily living as well as her response to medication and treatment. Tr. 31-32. Having considered the entirety of the record, the ALJ found Trepes not as limited as Trepes alleged.

Considering the foregoing, the Court finds that the ALJ did not err in his evaluation of Trepes' symptoms or in his evaluation of the evidence pertaining to fibromyalgia.

## VII. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

April 17, 2019

/s/ *Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge